IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | | |
|---|---|---|
| DIANA J. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | CV-10-3052-CL |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

CLARKE, Magistrate Judge:

## **INTRODUCTION**

Plaintiff Diana Johnson brings this action for judicial review of a final decision of the Commissioner of Social Security denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act. This court has jurisdiction under 42 U.S.C. § 405(g). The Commissioner's decision is reversed and remanded for an award of benefits.

1 - ORDER

## BACKGROUND

Johnson was forty-six years old at the time of the administrative hearing. Admin. R. 948. She has a high school education and a few years of college. *Id.* at 135. Johnson served in the U.S. Air Force for over ten years and received a medical discharge. *Id.* at 193. She has worked as a cook, waitress, sales person, vehicle operator, graphic illustrator and on a census crew. *Id.* at 131. She alleges onset date of disability from August 4, 1999, due to degenerative disc disease of the cervical spine, fibromyalgia, depression, Posttraumatic Stress Disorder (PTSD), and irritable bowel syndrome (IBS). Johnson's file was lost and the Appeals Council remanded the case to an Administrative Law Judge (ALJ) in 2005. A hearing was held before an ALJ on June 12, 2007 and a supplemental hearing was held on February 12, 2008. The ALJ issued an opinion on March 28, 2008. The ALJ found Johnson satisfied the insured status requirements for a claim under Title II through June 30, 2005. *Id.* at 21. Johnson must establish that she was disabled on or before that date to prevail on her DIB claim. 42 U.S.C. § 423(a)(1)(A). *See Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998).

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala,* 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner has established a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. 20 C.F.R. §

404.1520, *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The ALJ applied the sequential process and found that Johnson has the medically severe impairments of PTSD, depression, and degenerative disc disease of the cervical spine. Admin. R. 24. The ALJ found that Johnson did not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app.1. *Id.* at 25.

The ALJ found Johnson retained the residual functional capacity (RFC) to perform light work except that she is limited in the following ways: no continuous standing or walking for more than thirty minutes; no detailed tasks or detailed instructions; no interaction with co-workers or the general public; a work setting without frequent changes, and where the co-workers that she would be in proximity with would be limited in number. *Id.* at 25.

The ALJ found that due to her functional limitations, Johnson could not perform her past relevant work. *Id.* at 34. The ALJ solicited the testimony of a vocational expert (VE) who said there were jobs in the national economy an individual with Johnson's same age, education, past relevant work, and RFC could perform. *Id.* at 950-952. Based on the VE's testimony the ALJ found there were significant jobs in the national economy that Johnson could perform and was therefore not disabled. *Id.* at 34.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means more than a mere scintilla but less than a preponderance; it

3 -ORDER

is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)(citations omitted).

The ALJ is responsible for resolving conflicts in the medical evidence and determining

credibility. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). The court must weigh all

of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v.*

*Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). Under this standard of review, the court must uphold

the Commissioner's findings of fact, provided they are supported by substantial evidence in the

record as a whole, including inferences logically flowing from such evidence. *Batson v.*

*Commissioner of Soc. Sec. Admin.*, 359 F.3d at 1193; *Andrews v. Shalala*, 53 F.3d at 1039-1040;

*Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

## DISCUSSION

Johnson challenges the ALJ's determination of her RFC by alleging errors in the ALJ's

evaluation of medical evidence and her credibility. She asserts the ALJ failed to properly

determine the combined effect of her physical and mental impairments. Johnson also asserts the

ALJ erred by failing to properly weigh the determination of disability by the Veteran's

Administration (VA). Johnson argues that based on the above errors, the ALJ failed to include

all of her limitations in the hypothetical questions to the vocational expert.

I.      **Medical Evidence**

Johnson received a medical discharge from the Air Force in 1999. Admin. R. 193. The

Medical Board report indicates that Johnson had fibromyalgia and myofascial pain syndrome. *Id.*

An addendum to the report by Dr. Biron contained a diagnosis of generalized anxiety disorder,

PTSD, in partial remission, personality traits and coping styles affecting fibromyalgia, and

borderline and obsessive compulsive personality traits. *Id.* at 195-197. He noted she demonstrated moderate to severe impairment for military duty and her impairment for social and industrial adaptability was mild to moderate. *Id.* at 197.

The Veteran's Administration (VA) ordered a series of exams to determine her eligibility for disability in 2001. Dr. Montgomery diagnosed status post carpal tunnel release with some residual flare ups. *Id.* at 209-210. Dr. Monkarsh performed an examination and reviewed extensive VA records. *Id.* at 211-216. He diagnosed PTSD, chronic and severe, with secondary panic attacks; major depressive disorder, chronic, recurrent, moderate to severe; alcohol abuse in remission; with a Global Assessment of Function (GAF) of 41,[1] and a GAF of 45 based solely on symptoms related to her assaults while in the military. *Id.* Dr. Campbell found Johnson had chronic and severe fibromyalgia. *Id.* At 225-227. He noted she would not be able to do repetitive squatting or other movements; would need a very flexible work schedule to allow her to change positions at will and sit or lie down to rest as needed; and could only walk for one half to a mile at a time. *Id.* at 227.

The VA reached a disability rating decision in July 2002. *Id.* at 92-101. The VA rating system is distinct from the Social Security disability determination process. The VA rated Johnson's PTSD at 70%, but not considered permanent and subject to further review. *Id.* at 97. Her physical conditions were rated at less than 50% each but the combination resulted in a finding of nonpermanent disability. *Id.* at 100.

---

[1] The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 41 to 50 indicates serious symptoms (suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), 34 (4th ed. 2000).

The VA sent Johnson for a review examination for her PTSD on October 2, 2003. She was examined by Psychiatric Nurse Practitioner (PNP) Geils. *Id.* at 540-544. PNP Geils reviewed the VA records and noted Johnson had weekly panic attacks, frequent headaches, nightmares four times a week, daily dissociation, observed during the examination, and had experienced some visual hallucinations. She diagnosed PTSD, severe; pain disorder with emotional and physical aspects; major depression, recurrent with suicidal ideation; panic attacks; and alcohol abuse in remission. She noted Johnson was unable to leave the home due to unpredictable physical problems. PNP Geils further noted that Johnson only worked six days in 2001 which indicated difficulty with employment. She suggested a designation of permanent and total disability at this time. Her report was signed by Dr. Donnelly on October 17, 2003. *Id.* at 540. The VA determined Johnson was permanently disabled on March 24, 2004. *Id.* at 102-105.

Johnson began mental health therapy with a VA social worker, Ms. Spangler, in 2003 and continued seeing her for three years. *Id.* at 246-264, 644-656, 720-727. In addition, Johnson attended a VA women's sexual trauma group, and pain management groups from January 2004 through January 2008. *Id.* at 379, 398, 418, 425-426, 433, 442-444, 446-449, 586-588, 743, 745, 753-754, 776, 851, 868-869.

Her primary provider for mental health services was Psychiatric Nurse Practitioner (PNP) Miller who assessed Johnson in May 2003 for ongoing treatment. *Id.* at 505-509. She diagnosed PTSD with panic, fibromyalgia, myofascial pain syndrome, chronic neck and back pain, headaches, IBS, osteoarthritis and chronic obstructive pulmonary disease (COPD). She assessed a GAF of 45. *Id.* at 508. She provided medication management and some individual

therapy through 2007. *Id.* at 866-867. PNP Miller started Johnson on a trial of Wellbutrin in February 2004. *Id.* at 445-446. In July 2004, PNP Miller noted the medications were working well with no side effects and she developed a PTSD treatment plan. *Id.* at 404-407. PNP Miller changed Johnson's medications in March 2005 and again in May 2005, noting panic attacks and nightmares four times a week. *Id.* at 367-368, 602-603.

PNP Miller noted Johnson reported signs of Attention Deficit Disorder in October 2005 and she suggested another trial of Wellbutrin. *Id.* at 567-569. In December 2005 Johnson's husband complained about her medication and noted increased depression, panic attacks, and more nightmares. PNP Miller changed Johnson's medication. *Id.* at 557-559. In January 2006 PNP Miller noted Johnson was depressed but better and increased her medications. *Id.* at 783-785.

PNP Miller noted in March 2006 that Johnson had more depression and anxiety; that she was not able to attend meetings for her Mary Kay business due to panic attacks; she dissociates for hours; is disabled and unable to work; has nightmares and difficulty sleeping. *Id.* at 781-782. In August 2006 PNP Miller noted that increasing Johnson's medications had decreased Johnson's depression. PNP Miller also noted Johnson had no panic attacks; was back to selling Mary Kay part time; and her sleep was better with a C-Pap device. *Id.* at 755-756. In July 2007 PNP Miller noted Johnson stopped one of her medications, became suicidal and was hospitalized. *Id.* at 874-876. PNP Miller noted she was doing better in August 2007 on her new medications, with decreased anxiety, no panic attacks, and good sleep. She noted Johnson's scores for depression and anxiety were low. *Id.* at 869-871. However, in October 2007 PNP

Miller noted Johnson was feeling overwhelmed and her depression and anxiety were high. *Id.* at 865-867.

Johnson was admitted to a three month VA inpatient PTSD center in California on December 19, 2007. *Id.* at 884-889. However, she was discharged on January 8, 2008 due to an inability to make significant progress. *Id.* at 885. Her mental health discharge diagnosis was PTSD, major depressive disorder, rule out generalized anxiety disorder, chronic mental illness and exposure to trauma with a current GAF of 45. It was recommended that she continue to receive supportive therapy for PTSD and return if she developed appropriate interpersonal skills. *Id.* at 886.

Dr. Crossen, a state agency consultant, testified at Johnson's first administrative hearing on June 12, 2007 regarding her mental impairments. *Id.* at 907-908, 924-934. He testified about her impairments based on his review of the records from 1999 until June 2005, her date last insured. He stated she did not meet a listing and had mild limits in attention, concentration and pace based on the medical record, and moderate based on her self reports. *Id.* at 925-926. Dr. Crossen noted no limitations in activities of daily living, and mild to moderate impairments in interpersonal functioning. *Id.* However, he noted Johnson could feel unsafe working with the general public which would interfere with her ability to function effectively. *Id.*

Dr. Crossen also noted Johnson's depression could affect her perception of pain. *Id.* at 930. He cited her ability to function in group therapy consistently as indicative of her ability to function in a safe work environment with "no risks of men having unrestricted access to her." *Id.* at 931. Dr. Crossen noted Johnson had panic attacks, which he stated did not indicate a good level of function, but did not meet a listing. *Id.* at 933. His phone was cut off during this testimony.

8 -ORDER

Johnson received treatment for her physical problems from various providers, including the VA Medical Center (VAMC). In May 2003, Johnson had a physical therapy (PT) consultation at the VAMC and was given a home exercise and ice program and was to follow up for a TENS consultation. *Id.* at 497-499, 640-642. Dr. Medeck, a chiropractor, treated Johnson for arm, shoulder, neck and back pain, and headaches from June 2003 to January 2006. *Id.* at 276-346, 606-639.

Dr. Neill was her primary care physician (PCP) at the VAMC and managed her pain medications, such at Vicodin and Rofecoxib. *Id.* at 442. Dr. Neil noted in Mary 2004 that Johnson was satisfied with her pain medication regimen. *Id.* at 420-422. In December 2004, Dr. Neill noted Johnson had increased pain since a motor vehicle accident in September and she increased Johnson's Vicodin. *Id.* at 384-385. Dr. Saviers, a VAMC physician, did an EMG study on March 2, 2005 and noted it was most consistent with acute right C6 radiculopathy and there was no evidence of myopathy; bilateral medial, ulnar, or general peripheral neuropathy. *Id.* at 366. Dr. Neill noted the EMG study on March 16, 2005 and ordered a neurosurgery consult, physical therapy (PT), and increased pain medication. *Id.* at 363-364, 372-373.

On April 5, 2005 Dr. Osborn, an osteopathic physician, diagnosed myofascial pain syndrome which worsened following her motor vehicle accident in September 2004. *Id.* at 267-275. He also diagnosed acute C6 radiculopathy resulting solely from the accident. *Id.* Dr. Osborn recommended cervical epidural steroid injections from Dr. Greenburg. *Id.* On April 19, 2005, Johnson asked Dr. Neill about the findings from neurology, and Dr. Neill reiterated the EMG report and recommendations for continued PT, cervical traction, and possible injections. *Id.* at 350-352. Dr. Neill ordered PT, traction, and a consult with the pain clinic regarding the injections. *Id.* at 352.

9 - ORDER

Johnson had a VAMC PT consult on May 10, 2005 and she was instructed in activities of daily living and self care techniques, and given traction and ice. *Id.* at 599-601. On June 14, 2005 Dr. Neill noted that Johnson was receiving PT and traction at the VA but was receiving cervical steroid injections from Dr. Greenburg.[2] *Id.* at 591-593. Dr. Neill noted Johnson's nerve pain was gone but she complained of muscular pain due to increased physical activity; and headaches from the traction which she discontinued. *Id.* at 591. Dr. Neill recommended a PT follow up for muscle spasms. *Id.* at 592.

Dr. Thomashefsky began treating Johnson in December 2005. *Id.* at 668-673. He noted that her motor vehicle accident of November 2005 exacerbated chronic pain syndrome and fibromyalgia. Dr. Thomashefsky noted a mostly normal examination except for more limited range of motion (ROM) in her neck and shoulder, and moderate tenderness. He diagnosed cervical sprain/strain syndrome; bilateral tempomandibular joint disorder; thoracolumbar sprain/strain syndrome with sacroiliac dysfunction; and myofascial syndrome into right leg almost totally due to the motor vehicle accident. *Id.* at 673. He recommended continued chiropractic and massage treatments. *Id.* Dr. Thomashefsky noted on February 13, 2006 that he had started providing prolotherapy[3] with no immediate improvement. *Id.* at 666. He noted some improvement in March and that Dr. Medeck, her chiropractor, noted more stability in the neck and back. *Id.* at 665-666.

---

[2] There are no records from Dr. Greenburg.

[3] Prolotherapy involves injections of a sugar based solution into ligaments and tendons to stimulate production of connective tissue. David P. Martin, M.D., Ph.D., "Is prolotherapy an effective treatment for low back pain?" Mayo Clinic Health Information, available at http://www.mayoclinic.com/health/prolotherapy/ANO1330. Last visited September 1, 2011.

10 - ORDER

On May 12, 2006 Dr. Thomashefsky noted Johnson was better since starting the prolotherapy. *Id.* at 664. He noted on June 16, 2006 that despite some continued pain complaints her ROM in the shoulder was improved; her headaches were rare; and there was no evidence of radiculopathy in the lower back. *Id.* at 663. Dr. Thomashefsky recommended more PT through the VA and continued chiropractic care. *Id.* On July 13, 2006 Dr. Thomashefsky noted Johnson was better overall and he recommended continuing PT and chiropractic care. *Id.* at 662. In August 2006 Dr. Thomashefsky ordered and MRI which showed osteophyte formation and disk space narrowing at C5-6 , with no pressure on spinal nerves or cord. *Id.* at 658-661. He recommended a repeat treatment of prolotherapy in the neck and back and hormone replacement.

Johnson had a repeat of her EMG study on May 7, 2007 that was consistent with her previous study indicating right chronic C6 radiculopathy and suggestive of a right acute and chronic C7 radiculopathy. *Id.* at 816. It was recommended that she have an MRI of the neck, consider a TENS trial and possibly epidural injections. *Id.* On July 23, 2007 a repeat MRI noted multilevel degenerative changes, most severe at C5-6 with no foraminal narrowing or central canal stenosis. *Id.* at 818. Dr. Niles, from the NW Pain Network, examined Johnson regarding chronic pain management. *Id.* at 823-825. She noted decreased movement on the left sacroiliac (SI) region, and cervical ROM within normal limits. Dr. Niles assessed chronic pain with some somatic focus, PTSD, previous whiplash injury, and some mild SI joint dysfunction. She noted no radicular symptoms and recommended no interventional procedures. Dr. Niles recommended Johnson focus on function rather than pain level; continue PTSD courses, meditation, and therapy. *Id.* at 825.

Dr. Solomon conducted an examination for the state agency on September 10, 2007. *Id.* at 812-814. He noted chronic pain; mechanical back pain; disk degeneration of cervical spine as noted on MRI without evidence of radiculopathy; PTSD; fibromyalgia by history, but not present during examination; no lower extremity radiculopathy or sciatica. He opined she could lift at least twenty pounds; stand and walk for up to thirty minutes at a time; and did not need any assistive devices. *Id.* at 814.

Dr. Frank, a VAMC physician, conducted a neurosurgery consult on January 15, 2008. *Id.* at 877-878. He noted it appeared Johnson had some radiculopathy that was "going on in the framework of her fibromyalgia" and that it had been going on for years and was not a major problem. Dr. Frank noted no neurological sequella for the radiculopathy except the pain. He noted surgery would not be helpful and recommended PT with traction or injections. *Id.* at 878.

## II.   RFC

### A. Credibility

Johnson alleges the ALJ erred in assessing her credibility. The ALJ found that Johnson suffered from severe impairments that limited her functioning, but not to the degree asserted by Johnson. The ALJ must assess the credibility of the claimant regarding the severity of symptoms only if the claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Johnson has medically determinable impairments, mental and physical, which could produce her symptoms.

When there is an underlying impairment and no evidence of malingering, an ALJ may discredit a claimant's testimony regarding the severity of symptoms only by providing clear and convincing reasons based on specific findings. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir.

12 -ORDER

1993).  The ALJ has failed to provide sufficient convincing reasons to discredit Johnson's testimony regarding her limitations.

In assessing credibility, the ALJ may consider the claimant's daily activities, work record and the observations of physicians and third parties with personal knowledge about the claimant's functional limitations.  *Smolen v. Chater,* 80 F.3d at 1284-1285.  The ALJ took two statements by physicians out of context and used them to infer Johnson was not reliable.  The ALJ stated, "Examiners such as Dr. Biron refer to personality disorder, with traits not likely to result in accuracy such as borderline features.  More recently, Dr. Westrup noted a tendency to jump to negative conclusions regarding others."  Admin. R. 31.  In 1999, Dr. Biron, a VA psychologist, diagnosed generalized anxiety disorder; PTSD; personality traits and coping style affecting fibromyalgia; and obsessive-compulsive and borderline personality traits.  *Id.* at 197.  Nothing in his report suggests Johnson lacks credibility.

Dr. Westrup noted in 2008 that Johnson "struggled with constructive feedback, perceiving such input as negative, even hurtful . . .often missing the main message of a communication due to her own anxiety and internal thought processes."  *Id.* at 885.  Dr. Westrup noted Johnson could return to the inpatient PTSD program if she increased her listening and interpersonal skills.  *Id.* at 886.  She recommended Johnson receive therapy for PTSD and noted Johnson was "quick to make conclusions/interpretations re: others' intentions without checking out that information directly."  *Id.*  The ALJ does not state why this report reflects on Johnson's credibility regarding her own symptoms.

The ALJ cited an April 1999 performance report from the Air Force as evidence Johnson was capable of high functioning and adequate performance of duties.  *Id.* at 32, 198-203.  However, the memorandum accompanying the report indicated that Johnson was away up to 50%

13 -ORDER

of the time for medical appointments; complained of constant pain while on duty; asked for leave to go home nearly every day due to pain; was unable to complete training; lost emotional control; and her medications interfered with "alertness, comprehension, and information retainability. Medication may also produce emotional instability (sudden hostility, aggression, defensiveness, moodiness, and breakdowns.)" *Id.* at 199. The report, covering April 1998 to April 1999, while praising Johnson's talents, noted excessive "medical appointments away from duty section hindered supervision, upgrade training, and adversely affected duty performance-actual performance fell well short of expectations. Inconsistent performer-reliability and effectiveness oscillated between extreme highs and lows." *Id.* at 203. It is unclear why this work history supports the ALJ's opinion that Johnson could sustain work. While Johnson's performance prior to 1999 may have been adequate, the report demonstrates her decline. Johnson does not assert disability prior to 1999.

The ALJ may also consider objective medical evidence and the claimant's treatment history. *Smolen v. Chater*, 80 F.3d at 1285. The ALJ found Johnson's assertions of disabling symptoms inconsistent with information contained in her treatment records and the testimony of the expert witness, Dr. Crossen. Admin. R. at 25, 33. The ALJ noted a pattern of limited clinical signs noted by Drs. Osborn, Neill, and Thomashefsky and "essentially normal clinical signs" found by Drs. Niles, Frank and Solomon. *Id.* at 27. This is not exactly the case as these providers also referred to abnormal electrical testing and MRI results. Dr. Neill treated Johnson for chronic pain, noting in 2004 that Johnson's pain was chronic and severe; and noting in 2005 that Johnson continued to have C6 radiculopathy and disk problems shown by EMG testing and MRI. *Id.* at 350-352, 428-430, 591-593.

Dr. Osborn diagnosed myofascial pain syndrome and C6 radiculopathy. *Id.* at 274. Dr. Thomashefsky diagnosed cervical sprain/strain syndrome; bilateral tempomandibular joint disorder, thoracolumbar sprain/strain syndrome with sacroiliac dysfunction, myofascial syndrome, and noted her MRI showed degenerative disk disease in the cervical spine. *Id.* at 658, 673. Dr. Niles noted chronic pain, PTSD, mild SI joint dysfunction and previous whiplash injury. *Id.* at 825. Dr. Solomon diagnosed chronic pain; mechanical back pain; disk degeneration of cervical spine as noted on an MRI; PTSD, and fibromyalgia by history. *Id.* at 814. Whether or not Johnson's physical impairments alone are disabling is not the issue. The issue is whether the combination of physical and mental impairments are disabling.

Dr. Crossen is a nonexamining psychologist who testified at the hearing. He did not discount Johnson's diagnoses of PTSD and admitted that she had panic attacks. Dr. Crossen also noted Johnson's panic attacks did not indicate a good level of functioning and noted her depression could subjectively intensify her pain. He believed Johnson's ability to regularly attend group therapy sessions could be indicative of an ability to work in a "safe" environment. His testimony regarding her functioning level is in conflict with the opinions of the various examining and treating VA medical staff who found her disabled and severely depressed. *Id.* at 211-216, 540-544, 737, 781-782, 865-867, 884-888. The record also shows that Johnson's GAF ratings were consistently in the 40-45 range from 2001 through 2008. While GAF scores are not themselves sufficient to demonstrate disability, the consistently low ratings demonstrate that various mental health providers agreed on her inability to function well in social and occupational settings.

The ALJ also found Johnson's activities did not demonstrate disability. The ALJ noted Johnson's activities included painting, drawing, cooking, sewing, bird watching, walking a few

15 -ORDER

miles, going to the gym, taking trips, and visiting friends. The ALJ does not assert that Johnson did these activities daily. The ALJ also noted Johnson helped moved her grandmother into assisted living; had accompanied her husband hunting; was injured while her husband tested a jet boat; and occasionally went to Mary Kay meetings. The record shows that Johnson was unable to regularly attend Mary Kay meetings due to her depression and anxiety. *Id.* at 781, 865. If a claimant's level and type of activity is inconsistent with her claimed limitations, her activities have a bearing on her credibility. *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989). However, the Ninth Circuit has consistently recognized that engaging in limited activities does not constitute a basis for discrediting a claimant's testimony as to disability. *Vertigan v. Halter,* 260 F.3d 1044, 1049-1050 (9th Cir. 2001). Many home activities may not be easily transferable to a work environment, where it might not be possible to rest periodically, or take medication. *Fair v. Bowen,* 885 F. 2d at 603.

The ALJ may also employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning her symptoms, and other statements by the claimant that appear to be less than candid. *Smolen v. Chater,* 80 F. 3d at 1284. The ALJ noted that Johnson's history of injuries and accidents suggested that issues of "secondary gain" were present. Admin. R. 31. However, the ALJ does no more than allude to some kind of secondary gain without any explanation. Johnson reported two car accidents, one in 2004 and one in 2005, which led to exacerbation of her symptoms. *Id.* at 267, 668. The ALJ stated Johnson described significant symptoms, such as frequent headaches, to Dr. Osborn following a first motor vehicle accident in 2004, but noted Johnson always had headaches. Johnson reported headaches to providers up through 2003. *Id.* at 506, 544. She reported a motor vehicle accident in September 2004 and headaches were again noted in the medical

16 -ORDER

records after the accident. *Id.* at 363. Johnson reported an exacerbation of all pain symptoms and of a difference in her headaches following the accident to Dr. Osborn. *Id.* at 267-268. Johnson told Dr. Osborn that her steering mechanism broke, which the ALJ referred to as a "defective product." *Id.* at 31. However, there is no evidence of secondary gain from these incidents. *Id.* at 31, 812.

The ALJ also noted that Johnson's history of physical trauma "begins to strain belief." *Id.* at 31. Johnson worked for a while as a driver in the Air Force and apparently suffered several whiplash injuries as well injuries in as a body surfing accident while in the military. *Id.* at 204, 223, 225, 813. The fact that Johnson has a history of physical as well as emotional trauma is part of the record.

Although deference is usually given to the ALJ in matters of determining credibility, the standards for assessing credibility must be met. A finding cannot be supported simply by isolating some supporting evidence. *Gallant v. Heckler,* 753 F.2d 1050, 1056 (9ᵗʰ Cir. 1984); *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9ᵗʰ Cir. 1998). The record as a whole must be considered. *Id*, citing *Howard v. Heckler*, 782 F2d.1484, 187 (9ᵗʰ Cir. 1986). The ALJ has failed to provide sufficient persuasive reasons based on substantial evidence for rejecting Johnson's credibility.

## B. Opinion Evidence

Social security regulations specify that the most weight is given to the opinions of treating physicians, followed by examining physicians, and the least amount of weight is given to nonexamining experts. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9ᵗʰ Cir. 2001). The ALJ may reject an uncontroverted opinion by a treating or examining physician by providing clear and convincing reasons supported by substantial evidence. *Bayliss v. Barnhart,* 427 F.3d 1211, 1216

17 -ORDER

(9th Cir. 2005). An ALJ may reject the opinion of a treating physician if it is controverted by other treating or examining physicians if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002). . The ALJ may also reject physician opinions, whether or not controverted, when they are brief, conclusory and not supported by clinical findings. *Id.; Batson v. Commissioner of Soc. Sec. Admin.*, 359 F. 3d at 1195.

The ALJ discounted the opinions of the VA examiners and treatment providers that Johnson was unable to work because the "are unduly dependent on limited, subjective statements by the claimant herself, and must fall with evidence indicating that her credibility or accuracy is limited." *Id.* at 28. However, as noted above, the ALJ erred in discounting Johnson's credibility. The ALJ noted that Dr. Monkarsh gave Johnson a GAF of 41 in February 2001; PNP Geils gave her a GAF of 41 in October 2003, which was signed by Dr. Donnelly; and Dr. Westrup gave her a GAF of 45 in January 2008. *Id.* at 29-30. However, she found that therapist Goldberg and PNP Miller gave her "GAF values in the 40's range," without support to these conclusions. *Id.* at 31.

Although these scores, which indicate an inability to hold a job, represent a consistent pattern for Johnson, the ALJ adopted the opinion of the nonexamining psychologist that attendance in group therapy sessions, which were safe, could be transferred to a work setting. The ALJ stated, "Dr. Crossen's general indication that she could function in a safe situation is adopted." *Id.* at 33. A nonexamining psychologist's opinion is not substantial evidence unless supported by other evidence in the record. For support, the ALJ cites the 1999 report to the Air Force medical board by examining psychologist Dr. Biron, who noted, "she demonstrates moderate to severe impairment for military duty. Her impairment for social and industrial

18 -ORDER

adaptability is mild to moderate." *Id.* at 197. Dr. Biron noted that her prognosis for substantive

improvement in the short term was guarded to poor. *Id.* Dr. Biron was evaluating her fitness for

military service.

Dr. Monkarsh, a VA examiner, noted in 2001 that she had severe impairment in social

and occupational areas. *Id.* at 215. The 2003 reexamination by PNP Geils, approved by Dr.

Donnelly, recommended permanent and total disability noting Johnson was unemployable at this

time. *Id.* at 544. The notes from her other providers support an inability to work and severe

depression and anxiety. *Id.* at 728-734, 737, 781, 865-867.

Although Dr. Crossen's opinion, if supported by substantial evidence, could be sufficient

to contradict the examining and treating providers, in this case it is not. The ALJ cannot "cherry

pick" the evidence when the overall record demonstrates a long term inability to function

consistently well. *Tackett v. Apfel,* 180 F.3d 1094, 1098, (9th Cir.1999); *Sousa v.Callahan,* 143

F. 3d at 1243; *Gallant v. Heckler,* 753 F.2d at 1456.

### III.    VA Disability

The ALJ must ordinarily give "great weight" to a VA determination of disability.

*McCartey v. Massanari,* 298 F.3d 1072, 1076 (9th Cir. 2002). The ALJ may give less weight to a

VA disability ruling by giving persuasive, specific and valid reasons which are supported by the

record. *Id.* The ALJ did not provide persuasive, specific, and valid reasons supported by the

record for rejecting the VA disability finding. The ALJ's primary reason for rejecting the VA

determination rests on her opinion that the VA determination is based on Johnson's statements.

Admin. R. 31. Whether or not that is the case, the ALJ' credibility finding was itself flawed.

Therefore the ALJ has failed to provide persuasive, specific and valid reasons supported by the

record for rejecting the VA determination of disability.

19 -ORDER

**IV.    Remand**

The decision whether to remand for further proceedings or for immediate payment of

benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir.

2000), *cert denied*, 531 U.S. 1038 (2000).  The issue turns on the utility of further proceedings.

A remand for an award of benefits is appropriate when no useful purpose would be served by

further administrative proceedings or when the record has been fully developed and the evidence

is not sufficient to support the Commissioner's decision.  *Rodriguez v. Bowen,* 876 F.2d 759, 763

(9th Cir 1989).

Improperly rejected evidence should be credited and an immediate award of benefits

directed where

> (1) the ALJ has failed to provide legally sufficient reasons for
> rejecting such evidence, (2) there are no outstanding issues that
> must be resolved before a determination of disability can be made,
> and (3) it is clear from the record that the ALJ would be required to
> find the claimant disabled were such evidence credited.

*Harman v. Apfel*, 211 F.3d at 1178, citing *Smolen v. Chater,* 80 F.3d 1273, 1292 (9th Cir. 1996).

The ALJ erred in her credibility finding and compounded the error by using that flawed

finding to reject medical evidence and the evidence of disability from the VA.  Crediting the

rejected evidence would require the ALJ to find Johnson disabled.

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision is reversed and

remanded for an award of benefits.

IT IS SO ORDERED.

DATED this _____ day of September, 2011.

_____
MARK D. CLARKE
United States Magistrate Judge